In re MILLER PURE RYE DISTILLING CO. OF PENNSYLVANIA.
CONTINENTAL–EQUITABLE TRUST CO. et al. v. NOLAN.
TANEY v. SAME.

(Circuit Court of Appeals, Third Circuit.   May 26, 1914.)

Nos. 1835, 1836.

1. CORPORATIONS (§ 182*)—PROPERTY—RIGHTS OF STOCKHOLDERS.

Where a partnership engaged in operating a distillery formed a corporation and became its sole stockholders transferring the property of the firm to it, they had no title to whisky subsequently manufactured by the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 686–690; Dec. Dig. § 182.*]

2. BANKRUPTCY (§ 140*)—TRUSTEE—RIGHTS AS TO PLEDGED PROPERTY—VALIDITY.

The owners of all the stock in a distilling corporation contracted to sell the same to N. and, in order to facilitate his performance of the contract, allowed him to enter on the corporation's premises and take part in the management of the business. Without having been elected president of the corporation, he obtained money from a bank on notes executed by him as president and pledged, as collateral security, warehouse receipts for whisky distilled by and belonging to the corporation. Failing to comply with his contract, the stockholders of the corporation executed another contract to sell their stock to a New Jersey corporation organized by N., after which he was duly elected president of the original corporation and as such gave a new note in its name to the bank and repledged the warehouse receipts as security therefor. *Held*, that the pledge was valid as against the trustee in bankruptcy of the original corporation.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. § 140.*

Rights and liabilities of pledgees of stock, see note to Frater v. Old Nat. Bank, 42 C. C. A. 135.]

3. BANKRUPTCY (§ 293*)—ADMINISTRATION OF ESTATE—JURISDICTION.

Where, on the bankruptcy of a corporation organized to operate a distillery, it was the owner of certain whisky represented by warehouse receipts pledged to a bank subject to the pledge, the bankruptcy court had jurisdiction to determine the rights of the bankrupt and of the pledgee to dispose of claims of stockholders, and such jurisdiction was not affected by a subsequent sale of the whisky and the substitution of the proceeds in its place.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 411, 417; Dec. Dig. § 293.*]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

In Bankruptcy. Proceedings to determine rights of the legal representatives of the deceased partners of the firm of Miller & Mooney, Joseph A. Taney, as trustee in bankruptcy of the Miller Pure Rye Distilling Company of Pennsylvania, and J. Bennett Nolan, to the proceeds of a sale of certain whisky alleged to belong to the estate of the Distilling Company in bankruptcy. From a judgment entered on a master's report awarding a specified proportion of the proceeds to claimant Nolan and the balance to the bankrupt's trustee, the other claimants appeal. Affirmed.

See, also, 176 Fed. 606.

C. W. Van Artsdalen, Francis Shunk Brown, and Joseph Hill Brinton, all of Philadelphia, Pa., for appellants.

Joseph R. Dickinson and J. Bennett Nolan, both of Reading, Pa., for appellees.

Before BUFFINGTON and McPHERSON, Circuit Judges, and WITMER, District Judge.

J. B. McPHERSON, Circuit Judge. This controversy arises upon the distribution of a fund produced by the sale of 669 barrels of whisky. There are three claimants: (1) The legal representatives of the deceased partners in the firm of Miller & Mooney; (2) Joseph A. Taney, the trustee in bankruptcy of the Miller Pure Rye Distilling Company (the Pennsylvania corporation); and (3) J. Bennett Nolan,

who represents the First National Bank of Reading. The whole fund is claimed by the representatives of Miller & Mooney, and also by the trustee in bankruptcy, while Nolan's claim is restricted to $\frac{338}{669}$ thereof. These three claims were presented before the referee in bankruptcy, and afterwards were all involved in a bill in equity filed in the district court by the trustee; the sole object of the bill being to meet a possible objection that might be raised to the jurisdiction of the bankruptcy court. All parties agreed that the whole dispute— whether it should be heard in equity or in bankruptcy—should be referred to a master (George Wharton Pepper, Esq.) in order that he might "decide the questions in relation to the ownership of the whisky involved in the said bill in equity and the said petition, and the ownership and disposition of the proceeds derived from the sale of all or any part thereof, and all other questions involved therein, and file a report in each cause together with findings of fact and law."

The master's report recommended the dismissal of the bill on the ground that the controversy was completely within the jurisdiction of the bankruptcy court, and no objection has been made to this conclusion. He also reported, and the District Court decreed, that $\frac{338}{669}$ of the fund should be awarded to Nolan, and the balance to the trustee in bankruptcy, rejecting the claim presented on behalf of the firm of Miller & Mooney. The present appeals are taken by the representatives of the firm, and by the trustee; each appellant claiming the whole fund.

The case depends essentially upon questions of fact, and has been argued earnestly and with much ability. In our opinion the carefully considered report of the learned master has correctly disposed of the questions involved, and we think it a needless labor to repeat in other language what he has already said so well. We content ourselves with adopting his findings and conclusions:

This fund represents the proceeds of sale of 669 barrels of whisky, sold under order of the referee in bankruptcy, entered on March 2, 1911, and assented to by all parties. The fund therefore stands in the place of the whisky, and is to be disposed of in accordance with what are determined to have been the property rights of the parties in the whisky before it was sold.

The claim is made by the personal representatives of the decedents, Miller and Mooney, that the whisky, prior to the death of Miller, was a partnership asset of a firm composed of Miller and of the executors and trustees under the will of Mooney, and that no other person or persons ever acquired any right thereto. If this claim is sustained, the fund on deposit should be awarded to the personal representatives of Miller and Mooney.

The claim is made by Taney, trustee in bankruptcy of the Miller Pure Rye Distilling Company, that the whisky was, at the date of the bankruptcy, a corporate asset of the bankrupt corporation, and that no other person or persons had any rights therein or thereto. If this claim were sustained, the funds on deposit should be awarded to the trustee in bankruptcy.

J. Bennett Nolan claims to have acquired title to 338 barrels of the whisky purchased by him at a pledgee's sale of a certain warehouse certificate theretofore issued in the name of the Miller Pure Rye Distilling Company, and pledged to secure a loan evidenced by a note with the usual collateral clauses and purporting to have been issued by the Miller Pure Rye Distilling Company, by S. V. Nagle, president. If this claim were sustained, a proportionate part of the fund on deposit should be awarded to J. Bennett Nolan.

### Findings of Fact.

(1) Prior to April 14, 1902, a partnership composed of Cornelius J. Miller and the executors and trustees under the will of James Mooney, deceased,

owned a tract of land at Ryeland, Berks county, Pa., and a distillery and a bonded warehouse erected thereon. The partners were engaged in the distilling and selling of whisky under the firm name of Miller & Mooney.

(2) On or about April 21, 1902, a corporation styled the Miller Pure Rye Distilling Company was duly organized under the laws of Delaware. On or about January 16, 1903, this corporation became a domestic corporation of the state of Pennsylvania by compliance with the laws of the commonwealth, and acquired the ownership of the tract of land specified in finding No. 1, together with the distillery, warehouse, and other improvements thereon erected.

(3) Thereafter, to wit, during March, April, and May of 1903, the said corporation (hereinafter called the Pennsylvania Company) distilled the 669 barrels of whisky involved in these proceedings, and stored the same in the bonded warehouse upon the premises above referred to. At the date of this distillation, the Pennsylvania Company was the holder of a license from the court of quarter sessions of Berks county to operate the distillery and carry on the distilling business under the laws of the commonwealth.

(4) On June 30, 1903, the whisky distilled and stored as above set forth was the property of the Pennsylvania Company, and no title thereto or right therein had been transferred to Miller and to the executors and trustees under the will of Mooney. Miller and said executors and trustees were, however, at that date and at all times prior to January 29, 1907, the owners of all the capital stock of the Pennsylvania Company and had such interest in the said whisky, and such interest only, as resulted from their stock ownership.

(5) On June 30, 1903, Miller and the executors and trustees under the will of Mooney executed with Siegfried V. Nagle the following agreement:

"Whereas, Cornelius J. Miller is the owner of one hundred and fifty-one (151) shares of the capital stock of the Miller Pure Rye Distilling Company, a corporation organized under the laws of the state of Delaware, and the executors and trustees of the estate of James Mooney, deceased, are the owners of one hundred and forty-nine (149) of the capital stock of said corporation.

"And whereas, the said Miller and said executors and trustees of the estate of James Mooney are willing to sell said stock at the price or sum of three hundred dollars per share, and Siegfried V. Nagle is desirous of obtaining an option to buy from them all of said stock, and to pay for the same said price within the period of one year from and after this date.

"Now this agreement witnesseth: That for and in consideration of the sum of one dollar by each party unto the others in hand well and truly paid, the receipt whereof is hereby acknowledged, the said Miller, the executors and trustees of the estate of James Mooney, deceased, and said Siegfried V. Nagle do hereby agree to and with each other as follows, to wit:

"1. The said three hundred (300) shares of stock the said Miller and said executors and trustees of the estate of James Mooney, deceased, covenant and represent to be the whole and entire issue of shares of capital stock of said Miller Pure Rye Distilling Company, and they agree to sell the same to the said Siegfried V. Nagle at any time within one year from and after the date hereof at the price or sum of three hundred dollars per share. ·

"2. The said Miller and the said executors and trustees of the estate of James Mooney, deceased, agree that upon such purchase of said stock being made by said Nagle, all the indebtedness of said corporation will at the time of such purchase have been fully settled and paid off.

"3. The said Miller and the said executors and trustees of the estate of James Mooney, deceased, forthwith agree that the property and plant of said corporation shall remain as at present, pending the exercise of the option of purchase hereby given and granted to said Nagle.

"4. The said Nagle agrees to pay to said Miller and said executors and trustees of the estate of James Mooney, deceased, upon the ensealing and delivery hereof, on account of said purchase, the sum of one thousand dollars, and to pay unto them a further sum of two thousand dollars on account of said purchase at the expiration of thirty days from the date hereof, and to pay unto them a further sum of two thousand dollars on account of said purchase at the expiration of sixty days from the date hereof; which sums shall be forfeited to and become the absolute property of said Miller, and of the said executors and trustees of the estate of James Mooney, deceased, if

the other and further payments hereinafter provided for to be made by said Nagle or any of them be not made by him at the times and on the dates provided. Further payments on account of said purchase shall be made by said Nagle to said Miller and to said executors and trustees of the estate of James Mooney, deceased, as follows:

"Ten thousand dollars on or before September 30, 1903.

"Ten thousand dollars on or before October 30, 1903.

"Ten thousand dollars on or before November 30, 1903.

"Ten thousand dollars on or before December 30, 1903.

"Five thousand dollars on or before January 30, 1904.

"5. After the payment of the ten thousand dollars provided to be made on September 30, 1903, the said shares of stock shall be deposited in escrow with the Equitable Trust Company of Philadelphia, to hold and deliver pursuant to the terms of this agreement upon the performance of the covenants herein contained.

"6. The said Miller and the executors and trustees of the estate of James Mooney, deceased, now holding in their own names or in the names of said corporation, warehouse receipts for certain whisky now stored in the United States bonded warehouses at the distillery, they further agree that they will turn over these warehouse receipts to the said Nagle or to his assigns, upon the payment to 'them of the manufacturing price plus the carrying charges, both of which amount to forty thousand dollars ($40,000) always provided, that the said Nagle may withdraw such whisky and take up such warehouse receipts in such amounts less than forty thousand dollars ($40,000) as he may see fit; provided that the said Nagle or his assigns may avail himself or themselves only during the period of one year from the date of this instrument and further provided that said Nagle shall pay unto said Miller, and said executors and trustees of the estate of James Mooney, deceased, interest at the rate of six per cent. (6%) per annum from the date hereof on the value of the whisky in bond.

"7. After the payment of the ten thousand dollars provided to be made on or before September 30, 1903, fifteen thousand dollars ($15,000) having been paid by said Nagle, the said Nagle shall be responsible for all the expenses of operating the distillery of said corporation, and all the output thereof shall be accounted for to him upon the final settlement, he being entitled to credit therefor.

"8. It is hereby agreed that this agreement and all the provisions thereof and rights thereunder shall apply to the respective parties thereto and to their heirs, executors, administrators, successors and assigns."

(6) S. V. Nagle, the second party to the above-mentioned agreement of June 30, 1903, shortly after its execution, to wit, on or about July 13, 1903, caused a corporation to be organized under the laws of New Jersey under the name of the Miller Pure Rye Distilling Company. This corporation is hereinafter referred to as the New Jersey Company. The reason for its incorporation does not appear with sufficient clearness to enable the master to make any finding upon the subject.

(7) Shortly after the execution of the agreement on June 30, 1903, Nagle, in his individual capacity and not as an officer of the New Jersey Company, entered upon the premises of the Pennsylvania Company with the knowledge and consent of the other parties to the agreement. He took part in the conduct of the distilling business and discharged the various duties in relation thereto which are ordinarily discharged only by a corporate officer. In point of fact, however, Nagle never became a stockholder of the Pennsylvania Company and never became an officer or director thereof until elected president subsequent to January 29, 1907. During the time that he was discharging duties of management with the knowledge and consent of the other parties to the above-mentioned agreement, large quantities of whisky were sold to various purchasers, and warehouse receipts were issued to such purchasers, all bearing the signature "Miller Pure Rye Distilling Company, S. V. Nagle, President." Nagle continued to act as if he were an officer of the Pennsylvania Company until a date in 1905, at which time he was forcibly ejected from the premises, as is hereinafter set forth.

(8) On January 27, 1904, the First National Bank of Reading discounted

214 F.—13

two notes drawn in favor of the Miller Pure Rye Distilling Company, one for $8,170.78, of which W. H. Danby was the maker, and the other for $1,172.60, of which C. H. Conan was the maker. In discounting these notes, the bank supposed that it was giving credit to the Pennsylvania Company and had no knowledge of the existence of the New Jersey Company, or any intention of dealing with the latter corporation. The proceeds of the discounts were placed to the credit of the Miller Pure Rye Distilling Company and were drawn out by checks signed "Miller Pure Rye Distilling Company, S. V. Nagle, President." The notes were not paid at maturity and at some time prior to July, 1905, a note for $8,600 and a second note for $2,650, both notes signed "Miller Pure Rye Distilling Company, by S. V. Nagle, President," were given by Nagle to the bank in substitution for the earlier notes and were accepted by the bank in the belief that they were in fact the obligations of the Pennsylvania Company. As collateral security for the payment of the larger notes, Nagle delivered to the bank certificate No. 5339, dated May 16, 1905, for 350 barrels of whisky. The barrels of whisky corresponding to the certificate numbers on said certificate are included in the barrels of whisky in controversy in this cause. The certificate was signed "Miller Pure Rye Distilling Company, S. V. Nagle, President," was drawn in favor of the Miller Pure Rye Distilling Company, and indorsed "Miller Pure Rye Distilling Company, S. V. Nagle, President."

(9) Between June 30, 1903, the date of the agreement hereinbefore referred to, and December, 1905, Nagle paid large sums of money to the other parties to said agreement in partial discharge of his obligations thereunder. He did not fully comply, however, with the provisions of the agreement, and because of his failure to meet all the payments required by its terms he was ejected from the premises of the Pennsylvania Company in December, 1905, and Miller and the executors and trustees under the Mooney will thereupon took possession.

(10) Thereafter a new negotiation took place between Nagle and Miller and the executors and trustees under the Mooney will which resulted in the making, on January 29, 1907, of the following agreement between Miller and the executors and trustees under the Mooney will and the New Jersey Company, "By Siegfried V. Nagle, Prest.":

"Whereas, Cornelius J. Miller is the owner of one hundred and fifty-one (151) shares of the capital stock of the Miller Pure Rye Distilling Company, a Pennsylvania corporation, and A. H. Rufe and the Equitable Trust Company, as the executors and trustees of the estate of James Mooney, deceased, are the owners of one hundred forty-nine (149) shares of the capital stock of said corporation.

"And whereas, the said Cornelius J. Miller and said executors and trustees of the estate of James Mooney, deceased, are willing to sell said stock at the price of one hundred dollars ($100) per share, or the sum of thirty thousand dollars ($30,000) for the entire three hundred (300) shares and the Miller Pure Rye Distilling Company of New Jersey is desirous of purchasing the same at said price,

"And whereas, the said Cornelius J. Miller and the said executors and trustees of the estate of James Mooney, deceased, do covenant and represent that the said three hundred (300) shares is the full and entire issue of the capital stock of the Miller Pure Rye Distilling Company of Pennsylvania,

"And whereas, there are certain whiskies in the plant of the Miller Pure Rye Distilling Company of Pennsylvania at Ryeland, Pennsylvania, which are owned by the said Cornelius J. Miller and the said executors and trustees of the estate of James Mooney, deceased, which they are willing to sell, and which the said Miller Pure Rye Distilling Company of New Jersey is desirous of also purchasing,

"Now this agreement witnesseth: First, that for and in consideration of the sum of thirty thousand dollars ($30,000) paid by the said Miller Pure Rye Distilling Company of New Jersey to the said Cornelius J. Miller and the said executors and trustees of the estate of James Mooney, deceased, the receipt whereof is hereby acknowledged, the said Cornelius J. Miller and the said executors and trustees of the estate of James Mooney, deceased, do hereby sell, assign, transfer and deliver to the said Miller Pure Rye Distilling

Company of New Jersey the said three hundred (300) shares of the capital stock of the Miller Pure Rye Distilling Company of Pennsylvania, the same being the entire issue of the capital stock of said company, and the said Cornelius J. Miller and the executors and trustees of the estate of James Mooney, deceased, do hereby covenant and agree to deliver possession of the plant and property, except the whisky hereinafter mentioned, of the Miller Pure Rye Distilling Company of Pennsylvania, at Ryeland, Pennsylvania, and all other property of the said company, wherever situate, to the Miller Pure Rye Distilling Company of New Jersey on the execution of this agreement.

"Second. With the exception of the taxes due by the said Miller Pure Rye Distilling Company of Pennsylvania for the years nineteen hundred and five (1905) and nineteen hundred and six (1906), which the purchaser, the Miller Pure Rye Distilling Company of New Jersey, hereby assumes and agrees to pay, the said Cornelius J. Miller and the executors and trustees of the estate of James Mooney, deceased, hereby covenant and stipulate that there are no debts, taxes, liens, mortgages or charges against or due and owing by the said Miller Pure Rye Distilling Company of Pennsylvania, with the exception of the aforesaid taxes, but that the said company and its property are free and clear of any debt or encumbrance.

"Third. The said Miller Pure Rye Distilling Company of New Jersey agrees to purchase the whisky owned by the said Cornelius J. Miller and the executors and trustees of the estate of James Mooney, deceased, and now in the plant of the said Miller Pure Rye Distilling Company of Pennsylvania, at Ryeland, Pennsylvania, and agrees to pay therefor the following prices seventy-seven cents (77¢) per original proof gallon, together with interest at six per cent. (6%) from the fifteenth day of December, nineteen hundred six (1906), to the date the whisky is paid for, all whiskies distilled in the years nineteen hundred (1900) and nineteen hundred one (1901)—all excessive outage is hereby guaranteed to be made good to the purchaser, the Miller Pure Rye Distilling Company of New Jersey, by the sellers, the said Cornelius J. Miller, and the said executors and trustees of the estate of James Mooney, deceased, and fifty-two and a half cents (52½¢) per original proof gallon, together with interest at six per cent. (6%) from the fifteenth day of December, nineteen hundred six (1906) to the date of the payment for the whisky for all whiskies distilled in the year nineteen hundred three (1903)—all excessive outage is hereby guaranteed to be made good to the purchaser, the Miller Pure Rye Distilling Company of New Jersey, by the sellers, the said Cornelius J. Miller and the said executors and trustees of the estate of James Mooney, deceased, and one dollar ($1) per barrel together with interest from the fifteenth day of December, nineteen hundred six (1906) to date of payment for the whisky for all whiskies distilled in the year eighteen hundred ninety-nine (1899). And it is agreed between the parties hereto that the said purchaser, the Miller Pure Rye Distilling Company of New Jersey, may withdraw said whiskies in any amount or amounts, as it pays for the same, and the said sellers, Cornelius J. Miller and the said executors and trustees of the estate of James Mooney, deceased, agree to the issue and the delivery of the said Miller Pure Rye Distilling Company of New Jersey of warehouse receipts for said whiskies as the same are paid for by it.

"Fourth. It is further agreed by and between the parties hereto that none of the aforesaid whiskies except those distilled in the year nineteen hundred (1900) and the year nineteen hundred one (1901) shall be withdrawn under any other signature than the following:

"'Miller Pure Rye Distilling Company of Pennsylvania;
"'Countersigned, C. Percy Wilcox.'          "'Per S. V. Nagle, President.

"It is also agreed by the Miller Pure Rye Distilling Company of New Jersey, for and in consideration of the prices for which the said whiskies in this agreement are sold to it, that it will pay for the same within one (1) year from the date hereof, and the said Miller Pure Rye Distilling Company of New Jersey agrees to pay the sum of five thousand dollars ($5,000) at the end of said year to Cornelius J. Miller and said executors and trustees of

the estate of James Mooney, deceased, as liquidated damages, in case of failure to pay for said whiskies within the stipulated time.

"Fifth. The Miller Pure Rye Distilling Company of New Jersey agrees to place, maintain and keep twenty thousand dollars ($20,000) fire insurance upon the said whiskies mentioned in this contract until the same are paid for, and the said policy or policies are to be in the names of Cornelius J. Miller and the executors or trustees of the estate of James Mooney, deceased, and delivered to them at the execution of this agreement, and upon any renewals of said policies.

"Sixth. The Miller Pure Rye Distilling Company of New Jersey hereby agrees to indemnify the said Cornelius J. Miller and the executors and trustees of the estate of James Mooney, deceased, for any loss, payment of expense arising from their contract already made with the Philadelphia and Reading Railroad for the repair of the siding at the plant of the Miller Pure Rye Distilling Company of Pennsylvania, at Ryeland, Pennsylvania.

"Seventh. It is agreed between the parties hereto that this agreement cancels, annuls and makes void the contract dated June 30, 1903, between Cornelius J. Miller and the executors and trustees of the estate of James Mooney, deceased, and Siegfried V. Nagle, which contract was subsequently assigned by the said Siegfried V. Nagle to the Miller Pure Rye Distilling Company of New Jersey, and that the said parties of that contract and to this contract are hereby released and discharged from all liability and obligations under the same, and at the execution of this agreement said agreement and assignment are to be delivered up for cancellation."

As will appear by reference to this agreement, the parties contracted with one another upon the assumption that Miller and the executors and trustees under Mooney's will (and not the Pennsylvania Company) were the owners of the whisky now in controversy. The master has already found that the whisky, when originally distilled and stored, was the property of the Pennsylvania Company. He is unable to find any evidence which justifies him in concluding that at any subsequent time it ceased to be the property of the Pennsylvania Company and became the property of Miller and Mooney's representatives.

(11) Under the agreement of January 29, 1907, the New Jersey Company became the owners of the capital stock of the Pennsylvania Company and S. V. Nagle was elected president.

(12) The note for $8,600, held by the bank as the obligation of the Pennsylvania Company, was renewed from time to time, and each time the certificate for 350 barrels of whisky was repledged, until October 30, 1907, when the last renewal of the note was made and the certificate again repledged. Default was made in payment of this note and notice of public sale of the collateral was duly given by the bank, and a pledgee's sale was held on February 5, 1908, and at said sale J. Bennett Nolan was the highest bidder for three hundred and thirty-eight barrels of the three hundred and fifty barrels of whisky represented by the above-specified certificate. Nolan duly complied with the terms of sale.

(13) The Pennsylvania Company was duly adjudged a bankrupt by the United States District Court for the Eastern District of Pennsylvania on February 19, 1908. On March 24, 1908, Joseph A. Taney was duly elected trustee and qualified as such.

(14) On March 2, 1911, an order was made by the referee in bankruptcy with the consent of all parties in interest, authorizing the sale of the whisky in question. The sale took place and the net proceeds, amounting as above set forth to $9,166.23, were paid to the Equitable Trust Company to hold the same until ownership should be determined, at which time the trust company was to pay over the fund in accordance with such determination, together with such interest, not less than two per cent., as they might receive thereon.

### Findings of Law.

1. The whisky in controversy in this cause was, when originally made and stored, the property of the Pennsylvania Company and continued to be the property of that corporation until the adjudication of bankruptcy.

2. Nagle, although he did not formally become president of the Pennsylvania Company until subsequent to January 29, 1907, was allowed to hold himself out as an officer and agent of that corporation by Miller and the executors and trustees under the Mooney will prior to and at the date of the transactions with the First National Bank of Reading, set forth in the findings of fact.

3. The bank was justified in believing, and did in fact believe, that Nagle was acting for the Pennsylvania Company when the bank made the original discounts hereinbefore specified and subsequently accepted the notes given in substitution for the discounted notes, and received the collateral pledged as security for the notes so substituted. As a result of the conduct of the stockholders and officers of the Pennsylvania Company and of the conduct of Nagle, the bank became and was entitled by estoppel to assert liability on said notes against the Pennsylvania Company, and to hold and dispose of the collateral pledged as security therefor with the same effect as if Nagle had in fact received formal authority to pledge the credit of the Pennsylvania Company and to use its property as collateral.

4. The representatives of Miller's estate (who, because of Miller's death during the pendency of this proceeding, have been substituted upon the record) and the representatives of Mooney's estate had no right, title, or interest in or to the whisky in controversy, except as holders of all the stock of the Pennsylvania Company. Such stock ownership confers no right upon them which they can assert as against the creditors of the bankrupt.

5. In virtue of the pledgee's sale hereinbefore specified, J. Bennett Nolan became specifically entitled to 338 barrels of the 350 represented by the pledged certificate, and is now entitled to participate in the distribution of the fund in the proportion borne by the number of barrels bought by him to the whole number of barrels represented by the fund on deposit.

6. Subject to the rights of Nolan, as herein determined, the residue of the fund on deposit is the property of the trustee in bankruptcy and should be awarded to him.

### Disposition of Requests for Findings of Fact and Law.

(The decision of the master on these requests need not be quoted).

### Discussion.

The case as it presents itself to the master is not a difficult one to decide. When reduced to its simplest terms, the case stands thus:

[1, 2] Miller and Mooney, partners, own certain property and are engaged in distilling whisky. They become incorporated. Stock is issued to represent the partnership assets and the partners become the sole stockholders. In their corporate capacity they manufacture the whisky in controversy. Reciting themselves to be the owners of all the stock in the corporation, they make, in their own names, an executory contract for the sale of their stock and for the sale of the whisky in question. In order to facilitate Nagle's performance, they allow him to enter upon the premises while the contract is pending and to take part in the management of the business, for the purpose of earning the money with which to make the payments which the contract specifies. Nagle makes large payments on account, but fails of complete performance. He resorts to double dealing for the purpose of raising money. He organizes a New Jersey corporation and gives it the same name as that of the Pennsylvania Company. It may be that in so doing his purpose is to deceive; but this is by no means certain. He obtains money from the bank on paper which the bank understands to be the paper of the company which owns the distilling plant and is actually engaged in the distilling business, i. e., the Pennsylvania Company. He gives to the bank as collateral security warehouse receipts for the whisky which had been distilled by the Pennsylvania Company and is held on deposit in its bonded warehouse. Failing in performance of the executory contract, Nagle later negotiates another contract, this time between the stockholders of the Pennsylvania Company and the New Jersey Company. In pursuance of this contract, the New Jersey Company (or, through that corporation, the person who advances the purchase money) becomes the owner of the stock of the Pennsylvania Company.

The whisky is recited to be the individual property of the stockholders, and as to it the contract is an executory agreement of sale which the New Jersey Company never performs. Nagle, however, becomes the duly elected president of the Pennsylvania Company, and, in substitution for the paper theretofore held by the bank, gives a new note in the name of the Pennsylvania Company, per himself as president, and repledges the warehouse receipt for the whisky. The Pennsylvania Company is adjudged a bankrupt; the whisky is sold under a consent order; and the price realized on the sale is substituted for the property sold. The representatives of Miller and Mooney make the attempt which is always the favorite attempt of partners or stockholders in such cases, namely, to have a firm or corporate asset withdrawn from the reach of the firm or corporate creditors and treated as an asset of their separate estates. The general creditors represented by the trustee advance the contention which is usual in such situations, namely, that the property in question is assets for the payment of all creditors and is not to be appropriated to the payment of one claiming through a secured creditor who advanced money on the faith of a pledge.

In making this outline statement of the situation, the master is, of course, determining various disputed questions of fact. The conclusions of fact reached by him, however, are not only in harmony with what he believes to be the right of the testimony, but are in accord with what is likely to happen in cases of this sort.

The representatives of Miller and Mooney have little to say in support of their contention, except to refer to the fact that in the agreement of January 29, 1907, they asserted that the whisky was their individual property. It is clear, however, that they distilled the whisky in their corporate capacity. The property was therefore in the first instance an asset of the corporate estate, although the first request for a finding of law submitted on their behalf. declares that the title to it was transferred to the partners prior to June 30, 1903. It is entirely natural that the partners should have thought of it and spoken of it as their own property, exactly as Miller spoke and thought of it in his testimony at the foot of page 233. Their loose thinking, however, could not alter the fact; and the fact was that the whisky was corporate property and could become separate property only in virtue of a valid transfer. There is absolutely no evidence that any such transfer was ever made and no evidence that the master regards as sufficient that a transfer was even intended. There is evidence that the stockholders of the Pennsylvania Company intended to except the whisky from the sale of January 29, 1907, and to make provision for its acquisition by the New Jersey Company only upon payment of a consideration additional to the consideration given for the stock of the Pennsylvania Company. As a matter of substance, this reservation of the whisky has no other than a business significance. As a matter of form, it is consonant with the erroneous theory of the stockholders that the property had been their separate property from the beginning. The fact that they so regarded it is a final answer to the suggestion made in argument that in January, 1907, the stockholders are to be regarded as having in effect declared a dividend on this whisky among themselves. This suggestion is (as already pointed out) in conflict with the first request for a finding of law, and in the opinion of the master possesses no merit other than that of ingenuity. The arrangement that whisky distilled prior to January 1, 1904, should be withdrawn from the warehouse only upon the counter signature of a representative of the Miller and Mooney estates was an arrangement made to safeguard the reservation of the whisky from the executed sale of January 29, 1907. The effect of this arrangement and of the contract of that date was merely to prevent Nagle and the New Jersey Company from acquiring title to the whisky without making payment. It did not operate, as between the corporate estate of the Pennsylvania Company and the separate estates of Miller and Mooney, to convert the whisky from an asset of the former to an asset of the latter.

The elimination of the claim of the representatives of Miller and Mooney leaves for consideration only the issue between the trustee in bankruptcy and the purchaser at the pledgee's sale. The findings of fact already made dispose of the contention of Nolan to the effect that Nagle, prior to the agree-

ment of January 29, 1907, had any actual authority to pledge the credit and the property of the Pennsylvania Company. It is clear to the master, however, that, when the stockholders and officers of the Pennsylvania Company gave Nagle so liberal an opportunity to work out his contract with them, they gave him also, perhaps unwittingly, an equal opportunity to deceive innocent third persons as to his real relation to the property of the Pennsylvania Company and the business transacted there. In the case of the bank, all the elements of an equitable estoppel are present. The conduct of the officers and stockholders of the Pennsylvania Company was such as to create, naturally, on the part of the officers of the bank, a belief that Nagle was in responsible charge of the distillery and had the authority requisite to raise money for it and to secure the loan by a pledge. The officers of the bank were in fact misled exactly as might have been anticipated that they would be; and, being misled, they acted to their disadvantage. The Pennsylvania Company, its stockholders, its subsequent creditors, and the trustee in bankruptcy are estopped to deny the validity of the debt and of the pledge.

Apart, however, from the rights of the bank growing out of estoppel is the right resulting from the giving by Nagle to the bank on the 30th of October, 1907, of the note for $8,600 of that date, accompanied by a repledge of the warehouse receipt as collateral. There is no doubt that at the date of this transaction Nagle was the formally elected president of the Pennsylvania Company. He was cognizant of all past dealings with the bank; he knew that the bank regarded itself as having a claim against the Pennsylvania Company; he must have known that the proposition to substitute the obligation of the New Jersey Company would not have been acceptable to the bank, and that the note which he then gave had for its consideration the discharge of the pre-existing obligation. Under these circumstances, there arose on that date a legal liability on the part of the Pennsylvania Company to the bank, and not merely an equitable obligation growing out of estoppel. The repledging of the warehouse certificate was effective to make the bank a pledgee of the whisky represented thereby.

It has been assumed as the basis of Nolan's right that the Pennsylvania Company might make an effective pledge of whisky on storage in its own bonded warehouse by issuing warehouse receipts therefor and delivering the receipts to a creditor as collateral security. The question whether or not a distiller has such a right is a question not free from difficulty. The master, however, feels bound by the decision of the Circuit Court of Appeals for the Third Circuit in Taney, Trustee, v. Penn National Bank of Reading (1911) 187 Fed. 689, 109 C. C. A. 437 (since affirmed by the Supreme Court 232 U. S. 174, 34 Sup. Ct. 288, 58 L. Ed. —— Jan. 26, 1914)·and upholds the validity of the pledge in accordance with that decision.

[3] From the master's view of the facts and of the law, it follows that at the moment of bankruptcy, the whisky in controversy was the property of the Pennsylvania Company, subject to the rights of the pledgee in a proportionate part thereof. There is no doubt in the opinion of the master that the bankruptcy court had jurisdiction to determine the rights of the bankrupt and of the pledgee and to entertain and dispose of the petition of Miller and Mooney's representatives. The subsequent sale of the whisky and the substitution of a fund on deposit had no effect upon the jurisdiction of the court. Out of abundant caution and in order to remove all possible doubt about the question of jurisdiction, the trustee filed a bill in equity in the United States District Court for the Eastern District of Pennsylvania as of October Sessions, 1911, No. 717. The purpose of the bill was merely to assert the rights of the trustee to the fund on deposit as against the claim of the representatives of Miller and Mooney and of Nolan. According to the view taken by the master, the filing of this bill was really unnecessary because the situation was not one in which the trustee was seeking to establish the right of the bankrupt to the property in the hands of a third person. While orders of reference to the master were made in both causes, the master files his report in the bankruptcy cause only and suggests that the bill in equity should be dismissed.

The master recommends to the court that an order be made dismissing the petition of the representatives of Miller and Mooney, and awarding three

hundred and thirty-eight six hundred and sixty-ninths ($^{838}/_{669}$) of the fund on deposit to J. Bennett Nolan and the residue of the fund to Joseph A. Taney, trustee in bankruptcy of the Miller Pure Rye Distilling Company.

In each case the appeal is dismissed at the costs of the appellant, and the decree of the District Court is affirmed.